Karl L. SMITH, Appellant,

v.

UNITED STATES of America, Appellee (two cases).

Nos. 15645, 15646.

United States Court of Appeals Fifth Circuit.

May 25, 1956.

1. Williamson v. Hardwick, D.C., 135 F.Supp. 463; affirmed, 5 Cir., 227 F.2d 168.

**J.** Danforth Browne (of Macfarlane, Ferguson, Allison & Kelly), Tampa, Fla., for appellant.

James R. Billingsley, Atty., U. S. Department of Labor, Washington, D. C., James L. Guilmartin, U. S. Atty., Miami, Fla., for appellee.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

These two appeals challenge the legality of judgment and sentence imposed on appellant following trial of the two cases, combined by agreement of the parties. The first case, a prosecution commenced by the filing of an information, charged violation of the criminal provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., and the second, commenced by indictment, charged violation of § 1503 of the Criminal Code which prohibits corruptly endeavoring to influence, intimidate or impede a witness in a federal court, or influence, obstruct or impede the administration of justice.

The government accepts appellant's statement of the case, so we present it pretty much as outlined by the appellant.

Cause No. 15,645 is the appeal of Karl L. Smith from the judgment of the United States District Court for the Southern District of Florida, Tampa Division, in case No. 6157–T–Cr. wherein the appellant was adjudged guilty of employing certain persons in production of goods for interstate commerce for work-weeks longer than forty hours without paying such employees for hours in excess of forty at a rate not less than one and a half times the regular rate; and that he did unlawfully discharge a certain employee because said employee had filed a complaint with, and gave testimony to, the Wage and Hour and Public Contracts

Divisions of the U. S. Department of Labor; and that he did unlawfully transport, ship and sell in interstate commerce certain goods in the production of which employees were employed in violation of Section 7 (requiring overtime compensation) of the Fair Labor Standards Act, 29 U.S.C.A. § 207 (hereinafter referred to as the "Act"); which offenses are in violation of Title 29, § 215(a) (2), (3), (1) U.S.C.A., Section 15(a) (2), (3) and (1) of the Act.

Cause No. 15,646 is the appeal of Karl L. Smith from a judgment in the United States District Court for the Southern District of Florida, Tampa Division, in case No. 6424–T–Cr. In that case the appellant was adjudged guilty of corruptly endeavoring to influence, intimidate and impede certain witnesses in the case of the United States v. Karl L. Smith, No. 6157–T–Cr., then pending for trial in the District Court of the United States for the Southern District of Florida, in violation of Title 18, Section 1503, U.S. C.; and was adjudged guilty of corruptly endeavoring to influence, obstruct and impede the due administration of justice in that on or about the 21st day of March, 1953, he presented to the Assistant United States Attorney, an officer of the United States District Court for the Southern District of Florida, false affidavits and other communications concerning the case of United States v. Karl L. Smith, Criminal Action No. 6157–T, well knowing that the said case was pending trial in the said court, in violation of Title 18, Section 1503, U.S.C., and knowing the affidavits to be false.

The Information and the Indictment were consolidated for trial at the request of counsel for the United States and at the request of the defendant Karl L. Smith.

Throughout these proceedings to the date of filing notices of appeal, the defendant was without counsel, representing himself in *propria persona*. There is no contention that appellant was denied any constitutional right by reason of not having counsel, since the choice was his own, freely and knowingly made.

The appellant, Karl L. Smith, was alleged to have been engaged in the operation of the Lone Palm Preserving Company at Palma Sola, Florida, a crossroads village located approximately four miles from the City of Bradenton in Manatee County, Florida. The Lone Palm Preserving Company was engaged in the preparation and distribution of guava jellies and preserves. It was alleged that substantial portions of those guava jellies and preserves produced by Lone Palm Preserving Company were transported and shipped to many points outside the State of Florida.

The Wage and Hour and Public Contracts Divisions of the United States Department of Labor made an investigation of that business operation, Lone Palm Preserving Company, on various dates between August 27, 1951 and April 16, 1952. As a result of that investigation, the appellant was charged in a Criminal Information filed March 19, 1953, with five violations of the Fair Labor Standards Act; Count one of that Information alleging failure to pay minimum wage; Count two alleging failure to pay proper overtime compensation; Count three alleging discriminatory discharge; Count four alleging failure to keep records; and Count five alleging shipments in interstate commerce when in violation of the overtime section of the Act.

The United States dismissed Counts one and four, and at the trial on the charges otherwise alleged in the information, the appellant was convicted of Counts two, three and five.

Subsequent to the filing of the Criminal Information on March 19, 1953, to-wit the 21st day of March, 1953, the appellant prepared and obtained signed statements from several persons involved in the charges outlined in the Criminal Information. Said statements were ostensibly taken under oath and were presented by the appellant sometime about the 25th of March, 1953 to the Assistant United States Attorney in Tampa, Florida.

On November 18, 1954, the appellant was indicted on the basis of the affidavits

in five counts alleging violations of Title 18 U.S.C. § 1503. In substance the indictment alleges that the affidavits constituted a corrupt endeavor on the part of the appellant Karl L. Smith to influence, intimidate and impede certain witnesses in the case of the United States v. Karl L. Smith, Criminal Action No. 6157–T, and that said defendant did corruptly endeavor to influence, obstruct and impede the due administration of justice in that the affidavits and statement were presented to the Assistant United States Attorney for the Southern District of Florida and were false.

Upon the trial of the charges alleged in the indictment, the appellant was convicted on Counts two, three, four and ive and was acquitted on Count one.

The alleged errors are: (1) the defendant was prejudiced by reason of the fact that the trial judge on numerous occasions commented on the fact that the defendant had a right to testify in his own behalf; (2) the defendant was prejudiced by reason of the fact that the United States Attorney suggested in his argument that the defendant had not taken the witness stand in his own behalf; (3) the court erred in consolidating the cases for trial; (4) the verdicts were supported neither by substantial evidence nor by the weight of the evidence.

At the outset, it is appropriate to note that except for the fact that the appellant went to trial without counsel, any appellate court would be required to affirm these convictions without consideration of the points raised, because in no case did the appellant follow the basic requirements, universally recognized, to present for review the errors complained of. He made no timely objections; he made no motion for mistrial; he made no objections to the challenged actions of either trial judge or United States Attorney; and he made no timely or proper motion for new trial or for directed verdict.

In these circumstances we might well repeat what we said in Smith v. United States:[1]

"One reason the courts have found that assistance of counsel or an intelligent and competent waiver of such assistance is essential to due process in a trial under our Constitution is that the many technicalities of trial may sometimes affect the opportunity of the accused to have a real review of his trial on appeal. Johnson v. Zerbst, supra [304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461]. Once it is found, however, that such an accused has properly waived his right to counsel, the effects flowing from that decision must be accepted by him, together with the benefits which he presumably sought to obtain therefrom. * * * "

Upon such authority we might well be justified in dismissing the appeal for failure to present any grounds of error of which we could take notice. In what may be considered an excess of concern for the protection of the rights of appellant under the peculiar circumstances of this case, however, we proceed to a consideration of the points he relies on.

Here the court demonstrated great patience and unusual tolerance with the accused who undertook to combine argument, testimony in his own behalf, and interrogation of witnesses. The trial court would not conceivably have tolerated the self-serving statements made by the accused and his flat denials of statements made by witnesses, and his irrelevant comments, if made by a lawyer. In fact, the criticism now levelled at the trial court for referring to the right of the accused to testify in his own behalf arose entirely from the court's patient explanation, repeatedly made to Smith as he purported to cross examine government witnesses, that he could not argue with them or dispute them, as he repeatedly did, but that if he wanted to get his views to the jury he ought to take the witness stand. There is no merit in

the contention that the court prejudiced appellant by any of such statements or by all of them taken together.

■ With respect to the charge that the United States Attorney suggested that the accused should have taken the witness stand, the statement complained of is not, we think, susceptible of that construction. He said:

"And he continuously talks about these 'criminal actions' of the Department of Labor. These investigators, these criminal actions that they have performed. He had the opportunity to present any criminal action or what he thought was a basis for a criminal action in the form of testimony in the last two days, and you have seen none of it. And you won't see any of it. 'Criminal actions.'"

■ We think it quite clear that this was fair comment on the defendant's failure to produce witnesses touching on a subject which he injected in his conduct of the trial. During his argument and cross-examination of witnesses, he referred to alleged criminal acts of government witnesses. The comment by the United States Attorney that the accused had the opportunity to present any criminal action in the form of testimony is similar to that which was found by the court to be unobjectionable in Langford v. United States.[2] There a statement by counsel that "the defendant has no witness to impeach the stories of [government witnesses]" was held by the court to be in substance a statement that the stories were not contradicted. As this court has said in Jamail v. United States,[3] the rule against commenting on the failure of a defendant to testify in his own behalf "does not go to the extent of forbidding argument by counsel for the prosecution to the effect that the evidence against a defendant is uncontradicted." The same is true with respect to a failure to produce testimony on any phase of the defense upon which the accused seeks to rely.

■ As to appellant's complaint that he was prejudiced by a consolidation of the cases for trial, it is not the province of this court to put the trial judge in error for acquiescing in a request intelligently and competently made by the accused himself. Nothing appears to indicate that he was in any way misled into making the requests or that he was prejudiced by the consolidation.

■ Finally, we turn to the complaint that the jury's verdicts were unsupported by the evidence. It cannot be seriously argued that there was not substantial evidence of the violation of the provisions of the Fair Labor Standards Act. The principal attack is made on the strength of the government's case on the felony charges.

■ Although the indictment charged that the defendant "did corruptly endeavor to influence, intimidate and impede" the signers of the affidavit and statement concerned, the statute makes it an offense for any person to do any one of these things as to a witness or as to the administration of justice. We have held that it is proper to charge in the conjunctive the various allegations in the accusing pleading where a statute specifies several means or ways in which an offense may be committed in the alternative. Heflin v. United States;[4] Price v. United States.[5] A corollary to the rule of pleading in such matters is the rule that only one of the several means or ways of committing the offense need be proved. Heflin v. United States, supra; Crain v. United States.[6] Thus it was only necessary here for the government to prove as to each of the three persons named in counts two, three and four of the indictment that Smith had corruptly endeavored either to influence, or intimidate, or impede him as a witness in the

2. 9 Cir., 178 F.2d 48, 55.

3. 5 Cir., 55 F.2d 216, 217.

4. 5 Cir., 223 F.2d 371, 373.

5. 5 Cir., 150 F.2d 283, certiorari denied 326 U.S. 789, 66 S.Ct. 473, 90 L.Ed. 479.

6. 162 U.S. 625, 16 S.Ct. 952, 40 L.Ed. 1097.

pending cases, and as to count five, to prove that Smith corruptly endeavored either to influence, or obstruct or impede the due administration of justice by the filing of the allegedly false affidavit and petition.

It is amply demonstrated that both the affidavit and statement contained information that the jury could well believe to be false. It is also undisputed that the affidavit purported to be sworn to and to express an honest statement of the ostensible affiants, whereas each of the signers testified that he had not read it and had not sworn to it before the notary public. It is further in evidence, in support of count two of the indictment, that the witness Moore was intimidated by fear of losing his job into signing the affidavit.

We conclude that there was substantial evidence from which the jury was authorized to find by the required standard of proof that Smith endeavored to influence, intimidate or impede each of the witnesses. His act in obtaining their statements in the form of an affidavit which he prepared and presented to them to sign without reading or explanation and subsequently passed off on the prosecuting officers as documents solemnly sworn to, supplies the ingredient of "corruptly" doing the acts. The same is true as to the count relating to the corrupt endeavor to influence, obstruct or impede the due administration of justice.

The court finds no error on the record and the judgments are

Affirmed.

CAMERON, Circuit Judge (dissenting).

### I.

A reading of the long record in this case leaves the distinct impression that this appellant was convicted because of his cantankerousness and not because he violated the statutes under which he was prosecuted. To take each count of the *Indictment* and segregate and analyze the evidence touching it is to be convinced that there is not sufficient evidence to convict him of any count of the felony charge. With regard to the *Information,* it may be that a proper trial would disclose violations of one or more of the counts. But this record is so scrambled and contains so much inadmissible evidence that, in my opinion, we ought not seriously to consider affirming the conviction on any count of either the Information or the Indictment.

The net result of this prolonged and belligerent encounter between him and the Wage and Hour Department is that appellant has been fined a total of $5,500 —doubtless a figure coming close to the entire value of the plant involved—and has been sentenced to imprisonment for a total of thirteen and one-half years which, by making the sentences run concurrently, has been reduced to three years which must be served. In addition, it is clearly inferable that this small rural business will be destroyed and its six employees put out of jobs. And upon what charge?

Basically, the only criticism the Wage and Hour Department had of appellant's operation was that he refused to keep his books the way they wanted them kept. Even his archenemy, the Wage and Hour investigator, stated: "It is just as easy to be in compliance as it is to be in violation. It won't cost you any more." Out of that simple controversy which ought to have been resolved without any trouble if both parties had shown a little forbearance and magnanimity, the whole feud between appellant and the Labor Department, of which these proceedings are the final chapter, arose. That feud, in my opinion, is what was tried by the jury and was the basis for the very severe penalties assessed.

Appellant was wrong in his contention about how wages should be figured, but he was not illogical. Most of the apparently meager books he kept showed employment of himself and of the other handful of employees by the Lone Palm Preserving Company on a monthly basis. The amount paid was well in excess of the minimum wages required, including

overtime. The investigators insisted that appellant keep his books to show weekly wages and hours worked and rates per hour. If appellant had done that, he would have been in complete compliance. But he insisted on his books being tested for compliance on his paying overtime at one and one-half times the minimum wage, when the Regulations of the Department required that overtime be paid at one and one-half times the "regular rate".[1]

Of course, appellant's chief undoing resulted from his obstinate insistence upon handling his case before the jury. Not only was he no match for the government counsel, but every time he opened his mouth he succeeded in rubbing everybody in the court the wrong way until he built up such a crushing backlog of ill-will that the merits of the case were indubitably forgotten. But his faith in his own rectitude was such that he not only spurned proffered counsel but naggingly insisted upon speedy trial of his case.

### II.

To grasp the mistakes of law committed by the Court below it is necessary to understand and keep constantly in mind the narrow issues involved in the violations of law charged against appellant.

Counts I and IV of the *Information* having been dismissed by the Government, it is necessary to consider only the three remaining counts. Count II charged that appellant failed to pay six individuals the minimum wages provided in the Act. Count III charged that appellant unlawfully and wilfully discharged Rose B. Davis for filing a complaint against him (which she denied doing); and Count V charged that appellant shipped guava jellies and preserves in interstate commerce without paying the prescribed minimum wages to the employees producing them.

*The Indictment.* Count one resulted in an acquittal of appellant.[2] Counts two, three and four charged appellant with attempting corruptly to influence, intimidate and impede three separate persons as witnesses in the case made against appellant in the information. The asserted intimidation *consisted solely of appellant's act in procuring the affidavit, Exhibit 3, to be signed* and delivered to him.[3] Count five charged a like corrupt effort to impede the due administration

---

1. The investigator testified that the proper way to arrive at the "regular rate" was to multiply the monthly wage by twelve and divide that by fifty-two and take the result thus obtained and divide it by the number of hours worked in a particular week in order to get the base pay for that week. Appellant seemed honestly unable to understand that complicated method. The extended cross-examination of the investigator which he conducted, punctuated by much argument, showed over and over that this was the basic difference and the only difference between them. Of course, the investigator was right and appellant was wrong. That wrong was not grievous enough to give the slightest support to what the government is here doing to him.

2. It should be observed that this count on which appellant was freed is the one charging appellant with having attempted to intimidate Mrs. Davis, who was the main asserted victim in most of the government's proof and the one chiefly in-

volved in the so-called false affidavit, Exhibit 3.

3. Count Two involving R. C. Moore reads as follows:

"The Grand Jury Further Charges:

"That on or about the 21st day of March, 1953, at or near Bradenton, Florida, within the Southern District of Florida, Karl L. Smith did corruptly endeavor to influence, intimidate and impede R. C. Moore, a witness in the case of the United States v. Karl L. Smith, Criminal Action No. 6157–T, then pending for trial in the District Court of the United States for the Southern District of Florida, in the discharge of his duty as such witness, *in that he did cause Mr. Moore to sign and deliver to him an affidavit in which facts relevant and material to said case were falsely stated,* well knowing that the said case was then pending for trial in the said Court and well knowing that the said R. C. Moore was to be a witness in the said case and well knowing that the affidavit was false." [Emphasis added.]

of justice in that appellant *presented* to the United States Judge and the United States Attorney three false communications. It is interesting to note that the Government dismissed Count IV of the *Information* charging failure to keep records properly, which was the only real law violation asserted against him at the outset.

Evidence was proper, therefore, only with respect to these questions: Did appellant fail to pay the five individuals named the minimum wages provided by law? Did appellant wrongfully discharge Rose Davis because she made a complaint against him? Did appellant corruptly endeavor to impede, influence or intimidate R. C. Moore and Mr. and Mrs. Underwood by causing them to sign a false affidavit? Did appellant corruptly endeavor to influence, obstruct and impede justice by presenting to the Judge and the Attorney the alleged false communications? No evidence was relevant or admissible except evidence tending to sustain affirmative answers to those questions.

Yet the government set out deliberately to prove these palpably irrelevant and highly prejudicial facts: that appellant had told another investigator in 1945 that he would not comply with the book-keeping requirements of the Wage and Hour Law;[4] that appellant forbade Investigator McCutcheon to enter the plant to investigate the books or to interview any of the employees on its premises;[5] that appellant shut the plant down and ceased operations until statements taken by McCutcheon were returned to the ones who gave them; that appellant told McCutcheon that the government operators were a set of thieves and threatened to take a shot at McCutcheon;[6] and that appellant had demonstrated a guilty conscience.

None of that testimony had any tendency to furnish any sort of answer to the questions above set out, and none of it was relevant evidence in the case and all of it was highly prejudicial and inflammatory. If these collateral occurrences constituted law violations, they should have been made the subjects of prosecutions; but they should not have been used to prejudice the appellant in these cases.

I agree with the statement of the majority that the Court below demonstrated patience in its effort to deal with one whose unreasoning and bellicose attitude made everything he did irritating and provocative. But the trial Court did permit itself to be drawn unwittingly into

---

4. The investigator who worked up the case in 1945 resulting in appellant's pleading *nolo contendere* to an Information then filed, was put on the stand to prove that appellant told him he would not comply with the bookkeeping provisions of the law. After stating that he found appellant then paying fifty cents per hour straight time (the minimum then being forty cents) and that he "advised Mr. Smith that he must keep accurate records of his daily and weekly hours on all employees", he testified: "Q. Did he make any statement with regard to your advising him as to the law? A. He said he would not comply."

5. Appellant was within his rights in taking that attitude. The law gave the government agents ample and easy procedural devices by subpoena and otherwise for examining the records and talking with the witnesses. 29 U.S.C.A. § 209. Enforcement provisions contained in 15 U.S.C.A. §§ 49–50.

Moreover, adequate machinery was provided in the Act for enforcing its provisions by injunction. 29 U.S.C.A. § 217, and Rule 65, F.R.C.P., 28 U.S.C.A. The investigator held all of the trump cards, but he chose not to use them. Although he knew the history of the prolonged dispute, he elected to take a course which he is bound to have known would lead to this new controversy. Appellant claimed that the investigator promised not to enter the premises of the company, but he did so, went to the homes of the employees, neighbors and friends of appellant; and, using the persuasive power attending a government badge, he obtained statements from several of them.

6. "Come to think of it, I have a notion to take a shot at you." The final act in these acrimonious exchanges was that McCutcheon hung up the telephone while appellant was still talking.

what seem to me to be serious errors. Those errors consisted in the repeated making of statements in the presence of the jury which tended to draw its attention to the fact that the appellant could be expected to take the stand in his own behalf. This episode may be used to illustrate what happened: one of the government investigators was on the stand and appellant was cross-examining him about the meaning of certain provisions of a brochure the Wage and Hour Division had put out explaining the provisions of the Fair Labor Standards Act. An extended colloquy took place upon an objection by Mr. Muscarella, the government's attorney. Appellant was asking the attorney as to whether the digest he had in his hand was pertinent to the charge against him when this took place:

"Mr. Smith: You are probably talking about two different interpretations of the Wage and Hour Law. All I am trying to go by—all I have tried to go by—is a digest of the Federal Wage and Hour Law.

"Mr. Muscarella: If the Court please, if this man wants to testify he can take the stand. Whether he is going to stand there—

"The Court: If you want the jury to consider what you have to say Mr. Smith, you ought to testify in the case. If you want your statements to be considered by the jury as evidence—as testimony and evidence, you ought to testify—take the witness stand and testify and be subject to cross-examination under the rules of evidence."

That was an improper statement by the United States Attorney and an improper statement by the Court. In his effort to ascertain from the prosecuting attorney the relevance of the brochure which he wanted to question the witness about, appellant directed the remark to the government's attorney. A lawyer would probably have done the same thing —in other words, would have indicated

that the defense felt that it was justified in proceeding under the literature put out by the Labor Department. For the government's attorney and the Court to set upon appellant in this way was certainly prejudicial and unjustified.

It is not sufficient answer to say that appellant had made it a practice throughout the examination of the witnesses to make statements of fact and to argue with the witness rather than confining himself to asking questions. In all of this, appellant showed an ignorance and a naïveté almost juvenile.[7] At the same time, it was the duty of government counsel and of the Court to exhibit patience at every stage of the examination and to rule properly on objections and to refrain from saying anything from which the jury might infer that it had a right to look forward to testimony from the lips of appellant. The attorney now representing appellant before us points out nineteen instances where references of a similar character were made. Of course, many of them were relatively harmless, but all of them tended to stress the idea expressed in the above quotation. It was not the province of the Court under the circumstances of this case to lecture the appellant repeatedly on the manner in which he should conduct his cross-examination. It seems to me that the Court could have avoided error by simply sustaining the objections as they were made. Few rights are more jealously guarded by the courts than the right of the defendant, exercised by appellant here, to fail to testify without having that failure commented on before the jury. Cf. 18 U.S.C.A. § 3481. And see Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650.

Moreover, the investigators were permitted to testify before the jury in great detail as to what the various prosecuting witnesses had told them about the important facts of the case. In the early stages of the trial the Court intervened several times to shut off such testimony,

---

7. In his closing argument, the government's attorney referred to his attitude and conduct in these words: "It is comical if it wasn't so pathetic."

but towards the latter part of the trial, ceased its effort to keep out hearsay testimony. Finally, the Court, itself, brought out some hearsay and prejudicial testimony.[8]

The government attorney knew, when he put in the hearsay evidence, that appellant was not familiar with the rules of evidence and the Court knew the same thing when it asked questions calling for the hearsay testimony. The prosecution cannot escape responsibility for the introduction of that testimony and the other inadmissible testimony mentioned in this opinion.

### III.

It is perfectly plain to me that the Government failed completely to make out any case of violation of the statute under any count of the *Indictment*.[9] It is inconceivable that the mere *taking* of the three statements by the appellant could possibly violate any statute. *He had to make some use of them, or attempt to make some use of them, before the statute could be violated.*

Under the three counts charging appellant with having corruptly attempted to impede the three witnesses, it is clear that he could not be convicted unless he attempted to use the statement which had been given him to influence the testimony of these three witnesses. There was not a line of testimony that this was done. All three were used as prosecuting witnesses, and not one stated that appel-

---

8. "The Court: Did you check that, with each one? [Meaning each of the prosecuting witnesses.]

"The Witness: Well, *they said they worked up to seventy hours a week during that time.* During the off season they got back down around fifty hours.

\* \* \* \* \*

"The Court: You are entitled to that if you violate the \* \* \*.

"The Witness: If you violate the twelve hours a day or the fifty-six hours a week you don't get it. *Now those people told me* that during the busy season—and I think it is right—that they worked longer hours during that period because they have a long period of cooking and have to cook the stuff up and run it off.

\* \* \* \* \*

"The Court: Now, did you find that to be a fact?

"The Witness: Well, of course—

"The Court: From the parties here?

"The Witness: These people were regular employees and worked regular hours during the entire year, so that the assumption would have to be that the first fourteen weeks of that year—if you were using that exemption for preparation, etc. etc.—that that exemption would be ended at the end of the fourteen weeks." [Emphasis Added.]

9. I will not discuss the Information further, but am of the firm opinion that the case under the information should be tried on competent evidence stripped of all of the inflammatory features here set forth.

Moreover, it seems likely that Mrs. Davis, the prosecuting witness about whom much of the warfare was waged, ought properly to have been classified as an employee engaged in "administrative \* \* \* or local retailing capacity" under the exemption provided in 29 U.S.C.A. § 213(a).

In addition, by reason of the fact that the preserving business is fundamentally seasonal, most of the manufacturing activities taking place in the three months following September 1st, it seems likely that appellant was entitled to exemption under a regulation promulgated by the Administrator. This apparently gave special rights to appellant with respect to overtime pay for a period not exceeding fourteen weeks by reason of the seasonal character of the operation. It is inferable, from the testimony of the investigator, that the Wage and Hour Department applied this fourteen week period arbitrarily to the first fourteen weeks of the year when, undisputedly, appellant's busy season was entirely over before the beginning of that period.

The Court called McCutcheon back and conducted an extended examination of him, trying to develop whether much of the basis for prosecution did not disappear under that fourteen weeks' exemption. But he did not succeed in getting the facts developed to a point where I can understand them.

A court of justice ought not to stand by and see its ends thwarted because of the foolish effort of appellant to handle his own case and to be his own lawyer. In another trial all of these matters can be fully developed.

lant had ever mentioned the statement after it was taken. The fact is that not one of the three intimated that appellant had ever approached him in an effort to tone down his testimony although they had worked alongside of him daily for many months between the time the statement was executed and the trial of the case.[10] How could it possibly be said that appellant was corruptly endeavoring to intimidate or impede witnesses by the mere taking of the statement and putting it in his pocket?

Not only is the record completely barren of any evidence on this important point but the government's own witness showed that appellant's sole purpose and intent was to bring about, if he could, the prosecution of the investigators.

The Assistant United States Attorney placed on the stand by the prosecution to supply this essential ingredient of proof failed entirely to do so, but made out a complete defense to the indictment in all of its counts. After stating that appellant had come to his office four days after the information had been filed and subpoena served, the attorney testified as follows: "Karl Smith came to the building and came to my office *indignant and handed me these documents and urged that I, as Assistant United States Attorney, prosecute a man named Mc-Cutcheon and a man named Dulaney * * *.*" [11] Appellant, in cross-exam-

ining the attorney, provided the usual irritant by asking if the attorney did not consider his refusal to prosecute Mc-Cutcheon a "cover-up, a side-track, a whitewash".

It is perfectly plain that appellant did not use or attempt to use the so-called affidavit or the petition or any other paper for any purpose at all except to induce prosecution of McCutcheon. This positive evidence shows affirmatively that appellant never had any intention of attempting to use those documents in connection with the Information pending against him or to intimidate or impede the witnesses, or to influence the Court or the attorney as far as that prosecution against him was concerned. His sole purpose and effort were directed towards hitting back at his enemy by causing prosecution to be instituted. That may be some sort of a crime, but it is not the crime for which appellant was prosecuted.

It is, therefore, clear that the burden rested upon the government to prove beyond a reasonable doubt that appellant, in taking the statement known as Exhibit 3, f.n. 12, *infra*, did so with the intention of making use of that statement in some way calculated to influence the testimony of the witnesses in the case then pending against him. Failure to prove that intent is fatal to the government's case. The witnesses covered by the counts of the Indictment upon which

---

10. The only one intimating any approach to intimidation was the witness Moore who stated merely that he "figured" that he might lose his job if he refused to sign Exhibit 3. His opinion of what might happen to him was not probative evidence. Mrs. Davis answered categorically that there had been no effort at impeding or influencing her testimony.

11. Other statements to like effect as developed in the attorney's testimony are here quoted:
   "Q. And he desired that you take some action based on those statements; is that correct, sir? A. *That's right. If you will read one of those documents there you will see that it requests that Mr.*

*McCutcheon and Mr. Dulaney be prosecuted.* I never heard of Mr. Dulaney.
   * * * * *
   "Q. Did the filing of these affidavits cause you to withhold further action on that case? [Referring to the information pending against appellant.] A. No, sir. He was arraigned that day on that pending information.
   * * * * *
   "Q. In reading these documents, did you get the impression that one of them is a petition to the United States District Court * * * 'to prosecute to the fullest extent of the law J. B. McCutcheon * * *'? A. You say did I get that impression? *Those are, I believe the words of the document, and I took it to mean literally what it said.*"
   [Emphasis Added.]

appellant was convicted all testified. Not one of them gave the slightest hint that appellant had attempted to use the statement with them in any manner whatsoever. More than that, the testimony of the government attorney establishes beyond reasonable doubt that the sole intent of appellant was to use the statements in a proposed criminal prosecution against McCutcheon.

The government showed its acceptance of the foregoing statement of the law by requesting instructions defining intent. Without such a concession the law is plain. Morrisette v. United States, 1951, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288; Caldwell v. United States, 1954, 95 U.S.App.D.C. 35, 218 F.2d 370, and 67 C.J.S., Obstructing Justice, § 9, pp. 56–57.

Moreover, the government carried the burden of demonstrating the falsity of the affidavit upon which the indictment is based.[12] The witnesses who signed the affidavit were asked, one by one, whether they signed it, but not one of them was asked whether the affidavit contained any untruth. The farthest reach of the testimony concerning this document is that the witnesses did not read it over fully and did not go before a notary to swear to it. The affidavit demonstrates artlessness rather than perfidy. The jury must not have accepted the government's theory concerning Mrs. Davis because it found appellant not guilty of the crime charged against him in connection with his dealings with her. Much of the affidavit was expressive of the contention made explicit by the appellant throughout the trial,—that the prosecuting witnesses were not his employees, but that he, along with them, were employees of Lone Palm Preserving Company. He tried to stress in the en-

---

12. "State of Florida,
County of Manatee.

"Personally appeared before me, the undersigned authority in and for said state and county, Karl L. Smith, Rose D. Davis, Thomas D. Lathe, Robert C. Moore, Mattie M. Moore, Edith A. Underwood, Oscar N. Underwood, who, after being duly sworn, say:

"We are, (have been) working together, dba, Lone Palm Preserving Co. Palma Sola, Fla. a fruit growing and preserving operation, did have a caller, J. B. McCutcheon, who introduced himself as a member of the U. S. Department of Labor, about the middle of October, 1951.

"Said, J. B. McCutcheon did receive considerable time of each of us in a very courteous manner, was conducted through our plant with a fairly full explanation of our operation, but he was allowed to make no investigation, or examination of records, it being explained several times to him that the door was closed to any member of the U. S. Dept. of Labor, due to the Criminal acts of a former investigation and labor agitation.

"Karl L. Smith, Edith A. Underwood, and Oscar N. Underwood knew that Mrs. R. D. Coulter (Myrtle Coulter) very well, as she lived on the premises of the Preserving Plant in 1950 and 1951; state that at no time was said Mrs. R. D. Coulter hired or fired by Karl L. Smith, or the partnership dba Lone Palm Preserving Co. Mrs. R. D. Coulter was very

busy with a full time job at home taking care of three small children, the youngest, a baby in arms, about one year old, and husband.

"We, each of us, know that Karl L. Smith has not employed numerous employees of this establishment, and that each worker has drawn a guaranteed minimum of .75c (seventy-five cents) per hour worked, or more.

"We, each of us, know and state that Rose D. Davis has not been discharged by Karl L. Smith, nor has she been hired by him. She is not, nor has been since 1950 an employee of this establishment, but still is a worker here, and states under oath that she is satisfied, and wants to be left alone by the U. S. Department of Labor.

"(Signed)  Karl L. Smith,
            (Karl L. Smith),
          Robert C. Moore,
            (Robert C. Moore),
          Mattie M. Moore,
            (Mattie M. Moore),
          Edith A. Underwood,
            (Edith A. Underwood),
          Oscar N. Underwood,
            (Oscar N. Underwood).

"Sworn to and subscribed before me this 21st day of March, 1953.

"Clancy Hebb,
            Notary Public, State of
            Florida at Large.
My commission expires Dec. 4, 1955."

tire course of questioning that this was a co-operative venture. Whether it was a corporation or not was not developed unless the "testimony" of government's counsel in the closing argument is to be accepted as proof.[13]

The short of this phase of the case is that appellant was well within his rights in seeking material with which to petition the government attorney to prosecute McCutcheon. The witnesses did not belong to the government; and the Judge and the United States Attorney could not be regarded as untouchables. The sole use he sought to make of this meaningless document was to make an unsuccessful plea to the proper government official that prosecution be instituted against the government investigator. The government failed to produce evidence sustaining any count of the Indictment.

### IV.

It is not necessary to condone appellant's attitudes and actions to understand them. It is plain from this entire record that his was a natural, if too aggressive and uncontrolled, reaction to the all too prevalent officiousness of minor federal functionaries. The impulses which dictated his conduct were not different from those which are deepseated in every citizen of this country. Mr. Justice Brandeis once gave expression to the sentiments lying behind them.[14] Speaking of the protection guaranteed to individual citizens by the Bill of Rights, he said:

"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, *the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.* * * * Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." [Emphasis supplied.]

Those words naturally are not understood by the Cult of the Omnipotent Bureaucrat. Its members are captive to the fetish that men must be governed by those of superior wisdom and insight who make up the might of the central government. Their goal is that the reach of Washington may be so extended that its long, insensate arm may be laid upon the individual citizen wherever he may be, to the end that the intimate details of his life may be directed into selected channels and subjected to minute regulations. They are oblivious of the teachings of history that too much government from too far off has always been counted tyranny.

But appellant and the race of which he is scion know and understand those words and for centuries have counted them among the sacred shibboleths under which men can live happily and fruitfully. The tribe Smith from which he sprang—at once the backbone, the hope, the glory of this nation—has always been accustomed to build monuments to those in whose breasts the light of freedom has

13. "He talks about 'corporations'. Who is misleading in this case? There is no evidence of a corporation; but, in truth and in fact, the Lone Palm Preserving Company wasn't incorporated until after this indictment was returned in 1953. That is when the corporation was formed."

14. His dissent in Olmstead v. United States, 1927, 277 U.S. 438, 478–479, 48 S.Ct. 564, 572, 72 L.Ed. 944, cited with approval by this Court in Brock v. United States, 1955, 223 F.2d 681, 685.

**398**

burned brightest and who have been willing to sacrifice greatly to satisfy the yearning to be let alone. It ought not to be thought that this fire, fanned by men of the stature of Mr. Justice Brandeis, could be quenched by two brief decades of the Era of the Lost Sense of Proportion.

These considerations do not excuse the excesses to which appellant went under the goading of those who directed their efforts so repeatedly to this hamlet in the hinterlands of Florida, at a time when their reports admit that obedience to the complex structures of the Fair Labor Standards Act had not been achieved in fifty percent of the industry of the nation.[15] But they are important in testing and judging whether the government proved criminal intent on appellant's part,—that he acted "wilfully" or "corruptly". More than that, they ought to have served to inspire the government to be upon its mettle to see that, whatever the cost in patience, in forbearance, in understanding, in magnanimity, this entire episode including the trial in the Court below should be conducted in strict conformity with rules of fairness and with accepted concepts of Anglo-Saxon Justice.

And they lay upon us, too, the obligation to test these proceedings in all of their details in the light of these eternal principles, making sure that we have not joined in the demonstrated loss of perspective and that we stand ever ready to prevent plain miscarriages of justice. We have ample power to see that justice is done in this case. Cf. Rule 52(b), Rules of Criminal Procedure. I would reverse the judgment of the Court below with directions to acquit under the indictment and to try again the information under the standards here defined.

15. Quotations set forth in appellant's brief from the Annual Reports of the Wage and Hour and Public Contract Division of the Department of Labor show the percentages of "Establishments in violation of Basic Provisions", based upon those investigated, to be:

| 1950 | . | . | . | . | . | 51% |
|------|---|---|---|---|---|-----|
| 1951 | . | . | . | . | . | 56% |
| 1952 | . | . | . | . | . | 58% |
| 1953 | . | . | . | . | . | 57% |
| 1954 | . | . | . | . | . | 52% |