433 F.2d 1282
 Fed. Sec. L. Rep. P 92,920
Mark H. KROLL, William Cahn, William Criswell, Jack Chernau,
John S. Hunt, Robert C. Brown and Fred H, Adler, Appellants,
v.
UNITED STATES of America, Appellee.
 No. 24583.
 United States Court of Appeals, Fifth Circuit.
 Nov. 2, 1970, Rehearings Denied Dec. 10 and Dec. 28, 1970,
Rehearing DeniedJan. 6, 1971, Rehearing Denied
Feb. 11, 1971.
 
 J. Edward Worton, Key West, Fla., for Robert C. Brown and Jack chernau.
 Eugene P. Spellman, Miami, Fla., for Fred H. Adler.
 Carr & Warren, Hilton R. Carr, Jr., Herbert A. Warren, Jr., Miami, Fla., for William Cahn.
 Harry W. Prebish, Miami, Fla., for William Criswell and John S. Hunt.
 Walters, Moore & Costanzo, David W. Walters, Miami, Fal., for Mark H. Kroll; S. Harvey Ziegler, Miami, Fla., of counsel.
 Michael J. Osman, Asst. U.S. Atty., Miami, Fla., for appellee.
 Before PHILLIPS,* BELL and SIMPSON, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 The appellants, Mark H. Kroll, William Cahn, William Criswell, Jack Chernau, John S. Hunt, Robert C. Brown and Fred H. Adler, are here seeking relief from judgments of conviction entered after jury verdict of guilty[1] in the district court. They raise a myriad[2] of grounds upon which they claim that the convictions are defective. We affirm.
 
 
 2
 The indictment charged and the jury found that the defendants had engaged in a scheme to defraud investors in the offer and sale, through American Bonded Mortgage Company, Inc. (ABM), and affiliated companies, of notes secured by mortgages, promissory notes, evidences of indebtedness, investment contracts and mortgage insurance bonds during the period from about January 20, 1958 to about December 31, 1961.
 
 
 3
 The facts of this case are multi-faceted and extremely complicated. Because of the nature of the challenges raised here and discussed infra it is not necessary that we recount in detail the lengthy and involved scheme alleged. Succinctly stated, it was alleged that the defendants engaged in an intensive campaign whereby risky and virtually worthless mortgages were purchased from sources affiliated with ABM, a company established to deal in mortgages, were represented to be fully insured as to interest and principal by what in fact was a financially unsound ABM-affiliated insurance company, and were sold to the public by means of false and misleading advertisements and other false statements made to investors. In December, 1961, ABM was petitioned into bankruptcy along with its affiliated companies after allegedly defrauding investors of millions of dollars.
 
 
 4
 We proceed to discuss in some detail the points raised which we consider worthy of discussion.
 
 I.
 SUFFICIENCY OF EVIDENCE TO SUSTAIN CONVICTION
 
 5
 Each of the defendants except Cahn asserts that there was insufficient evidence in the record to support his conviction, and that it was error for the court to deny the respective motions for judgments of acquittal. On a motion for judgment of acquittal the test is whether, in the view most favorable to the government, a reasonably-minded jury might accept the relevant evidence as adequate to support a conclusion of the defendants' guilt beyond a reasonable doubt. Glasser v. United States (1942) 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Mortensen v. United States (1944) 322 U.S. 369, 64 S.Ct. 1037, 88 L.Ed. 1331; Davis v. United States, 5 Cir. 1967, 385 F.2d 919; Lambert v. United States, 5 Cir. 1958, 261 F.2d 799; Vick v. United States, 5 Cir. 1954, 216 F.2d 228, 232. These jury verdicts, then, must be permitted to stand if there is substantial evidence to support them, taking the view most favorable to the government, without weighing conflicting evidence or testing the credibility of the witnesses, and allowing in favor of the verdicts all reasonable inferences from the evidence.
 
 
 6
 The government introduced evidence tending to prove that the defendants developed a highly-organized sales campaign replete with half-truths, misrepresentations, and other deceptive techniques in order to interest investors in purchasing mortgages. The salesmen were furnished with complete sales kits extolling the financial soundness of the program offered. The sickly financial condition of ABM was not disclosed to investors. Salesmen were instructed to tell prospective investors that the mortgages were on 'preferred, selected, single-family Florida homes', when in truth many of the mortgages encumbered much less desirable properties. It was represented that the mortgages were insured by a policy which was authorized by the Florida Insurance Commissioner, when the Commissioner had not so approved the policy. Investors were told that investments in mortgages were 100% Safe because the mortgages were insured, when in fact the ABM-affiliated insurance company was inadequately financed to insure fully the risks presented. Relevant matters withheld from investors included: ABM's lack of mortgages in inventory, the poor quality and near worthlessness of mortgages assigned, the fact that mortgages were often on vacant land and hence uninsurable or illegally insured under Florida law, the fact that mortgages were junior to other liens of millions of dollars, and finally the fact that the insurance bonds were of little protection and were issued by an insurance firm affiliated with ABM. Evidence indicated that investors' funds were used to make interest payments to other investors because defaults on mortgages had reduced ABM's cash supply. Evidence also tended to show that the defendants had improperly diverted company funds for their own personal use, and for the purpose of financing other projects of interest to the defendants.
 
 
 7
 Defendants contend that they relied in good faith on the advice of counsel in operating this business. Significantly, however, the counsel upon whose advice they claim they relied was not called as a witness. In fact evidence was introduced by the government that house counsel had admonished the defendants that delivery of mortgages before houses were completed on the properties might be fraudulent, and that Florida law did not allow insurance of vacant lot mortgages. Outside counsel had also advised that apparent misrepresentations might be violations of the anti-fraud provisions of the securities laws. Letters from Aetna and Kemper insurance executives, who issued fidelity bonds to ABM, indicate their concern over misrepresentations made in ABM's advertising. Nevertheless the operation continued.
 
 
 8
 Although the numerous defendants were involved at different times and to differing degrees in the perpetration of this scheme, there was plentiful evidence at trial from which a jury could reasonably find beyond a reasonable doubt that all participated knowingly in the unlawful acts for which they were indicted. The defendants were free to introduce evidence of good faith reliance upon counsel as tending to prove they lacked criminal intent, but the jury was not bound to accept this evidence. The record contained other competent evidence from which the jury could find that the defendants in fact acted with the requisite intent to defraud.
 
 II.
 PRE-INDICTMENT DELAY
 
 9
 The indictment which was returned on February 15, 1966, alleged that the conspiracy terminated on December 31, 1961. The appellants contend that they were deprived of a fair and speedy trial by virtue of a delay of over four years measured from the date of termination of the scheme to the date of the return of the indictment.
 
 
 10
 The applicable statute of limitations in this case is five years. It is well-settled in this Circuit that the Sixth Amendment right to a speedy trial and the rights granted by F.R.Crim.P. 48(b) do not accrue to a defendant until after a prosecution is instituted. United States v. Grayson, 5 Cir. 1969, 416 F.2d 1073, 1076-1077, cert. denied 396 U.S. 1059, 90 S.Ct. 754, 24 L.Ed.2d 753 (1970); Harlow v. United States, 5 Cir. 1962, 301 F.2d 361, cert. denied 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 56 (1962). Any delay between commission of the crime and indictment is controlled by the applicable statute of limitations. United States v. Grayson, supra; Bruce v. United States, 5 Cir. 1965, 351 F.2d 318, cert. denied 384 U.S. 921, 86 S.Ct. 1370, 16 L.Ed.2d 441 (1966). The defendants urge that we adopt the reasoning of United States v. Parrott, 248 F.Supp. 196 (D.D.C.1965), wherein an indictment was dismissed in part because the court found that the defendants had been unduly prejudiced by unexcused pre-indictment delay. Even if Parrott was the applicable law of this Circuit-- which it is not-- the case would not be applicable to the situation at hand, for the defendants have not sufficiently demonstrated any prejudice stemming from the lapse of time prior to indictment.
 
 III.
 GRAND JURY ARRAY
 
 11
 The defendants allege that the grand jury selection process in the Southern District of Florida is discriminatory and does not represent a fair cross-section of the community. This contention was specifically rejected in Stassi v. United States, 5 Cir. 1968, 401 F.2d 259.
 
 IV.
 CAHN'S MOTION FOR CONTINUANCE
 
 12
 Defendant Cahn argues that the trial court abused its discretion in denying his motion for a continuance so that counsel might have additional time to prepare for trial. After the indictment was filed Cahn was initially represented by an attorney who filed various pre-trial motions and participated in pre-trial proceedings. Four weeks prior to trial, this attorney was allowed to withdraw from the case with respect to representation of Cahn. Cahn took sixteen days thereafter to retain new trial counsel. Twelve days prior to trial new counsel made an oral motion for continuance. The court denied it immediately.
 
 
 13
 Apart from calling attention to the shortness of time for preparation, Cahn has not demonstrated that trial counsel was prevented from properly defending him or that he was otherwise prejudiced by being required to go to trial. In fact, the record shows that trial counsel vigorously participated in the trial and demonstrated a full range of trial talents and knowledge of the case. We find no abuse of discretion by the trial judge, and no prejudice flowing to the defendant Cahn from the denial of the continuance.
 
 V.
 SEVERANCE
 
 14
 Defendant Kroll claims that Cahn and Criswell had testified in a prior bankruptcy hearing that Kroll did not dominate ABM as the indictment alleged. Kroll here alleges that if a severance had been granted Cahn and Criswell would have repeated their testimony exculpating Kroll, and that the joint trial deprived him of the opportunity to call the two men as his own witnesses. However, when Cahn and Criswell took the stand in their own behalf they made statements tending to exculpate Kroll. The jury was free to accept this testimony. Kroll has not demonstrated an abuse of discretion by the trial court in this respect. Smith v. United States, 5 Cir. 1967, 385 F.2d 34.
 
 
 15
 With regard to the other defendants, we likewise find no prejudice from the denial of severance. Each defendant was named in each count of the indictment, and there was thus no danger that the jury would be confused or misled into considering evidence in the case of a defendant to which it did not apply. The defendants' reliance on Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) is of course entirely misplaced. Here no confessions or out-of-court inculpatory statements by any defendants were introduced, and all of the defendants did take the stand and were fully available to each other defendant for cross-examination.
 
 
 16
 When possible without prejudice to the rights of defendants joint trial aids in the efficient administration of justice. Particularly is this so when, as here, severance would require the expense of several long trials involving substantially the same evidence. The various arguments that some of the defendants played larger roles than others in the alleged conspiracy, or that some of the defendants had allegedly 'antagonizing personalities' which a jury might not like, or that the impeachment of one of the defendants might 'rub off' on the other defendants, taken singly or together, do not present grounds for separate trials. The trial court fairly and fully admonished the jury during his complete and detailed instructions to consider the guilt or innocence of each defendant only upon the evidence introduced against him and to determine its verdicts separately as to each defendant under each count of the indictment.
 
 VI.
 READING OF THE INDICTMENT
 
 17
 Appellant Hunt urges that it was error for the trial judge to read the indictment to the jury. The trial judge's instructions informed the jury that the indictment was not evidence, that it did not raise a suspicion of guilt, and that it was merely the method by which persons are charged and brought to trial. There was no error. United States v. Press, 2 Cir. 1964, 336 F.2d 1003, cert. denied 379 U.S. 965, 85 S.Ct. 658, 13 L.Ed.2d 559; United States v. Martin, 2 Cir. 1955, 223 F.2d 666, 667; Blauner v. United States, 8 Cir. 1961, 293 F.2d 723, 736; Laughlin v. United States, 1967, 128 U.S.App.D.C. 27, 385 F.2d 287, 295, cert. denied 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103; United States v. Hoffa, 7 Cir. 1966, 367 F.2d 698, 713, vacated on other grounds, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738. See further Williams v. Beto, 5 Cir. 1966, 354 F.2d 687, and cases there cited.
 
 VII.
 SEARCH QUESTION
 
 18
 We deal here with one of the more difficult issues of the case. Cahn complains that his motion to suppress the search of the books of an affiliated company of ABM, as well as the fruits of such search, was erroneously denied because the evidence was obtained through an unlawful search. Cahn was the sole stockholder and president of the company. When the company was petitioned into bankruptcy, the referee in bankruptcy ordered the trustee to take possession of and remove the records from the premises of the company. The appellants did not object to the taking of possession by the trustee. One and a half years later, an accountant for the Securities and Exchange Commission requested permission from the trustee to examine the books. Permission was granted. The accountant remained on the scene for two years and evidence gathered as a result of the examination was presented to the grand jury and at trial. The two principal issues raised are (1) Cahn's standing to object to the search, and (2) the authority of the trustee to consent to the search.
 
 
 19
 Our discussion begins with Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Jones was the occasional guest of the owner of an apartment. The owner had given Jones the key. The police searched the apartment while Jones was present, and seized narcotics which they found in a bird's nest in an awning outside the window. The Supreme Court held that Jones had standing to contest the search, noting that the search was directed at Jones because his privacy had been invaded. Mr. Justice Frankfurter, writing for the Court, said:
 
 
 20
 'In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else'. 363 U.S. at 261, 80 S.Ct. at 731.
 
 
 21
 Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1967), further considered the issue of standing. This case dealt with the seizure of labor union documents from an office shared by the objector and several other union officials. It was held that the official had the requisite standing to object to the search because it was a 'private office' in which DeForte could reasonably expect that only union officials or their personal or business guests would enter.
 
 
 22
 In Mancusi the Supreme Court pointed out that standing to object to a search or seizure belongs to one who has title to the premises searched, or to one who has a possessory interest in the premises, or to one legitimately on the premises where the search occurs. It was further there stated that Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), established that the right to claim the protection of the Fourth Amendment depends not only on a property right in the invaded place, but also upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion.
 
 
 23
 In Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Supreme Court reaffirmed the vitality of Jones:
 
 
 24
 'Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppression of relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy.'
 
 
 25
 'The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth'. 394 U.S. 173-175, 89 S.Ct. 966-967.
 
 
 26
 Mr. Justice Fortas dissented in Alderman, urging:
 
 
 27
 'The Government violates his rights when it seeks to deprive him of his liberty by unlawfully seizing evidence in the course of an investigation of him and using it against him at trial'.
 
 
 28
 Although concededly the question is close we conclude that Cahn does not have standing to complain about the search. Once the corporation was in bankruptcy, Cahn no longer had any title in the corporate records, as title passed by operation of law to the trustee in bankruptcy. Title 11, U.S.C., Section 110; Bisno v. United States, 9 Cir. 1961, 299 F.2d 711. Neither did Cahn have any possessory interest in the corporate records. The records were examined on the premises of the trustee in bankruptcy, and no area in which Cahn had an interest was violated. Only corporate records, and not personal records of Cahn were examined. In this regard, see also Elbel v. United States, 10 Cir. 1966, 364 F.2d 127.
 
 
 29
 We think also that any 'reasonable expectation' or agency argument proceeds on an erroneous concept of the role of a trustee in bankruptcy. The trustee is not the exclusive agent of the bankrupt, but rather is an officer of the court and a representative of creditors as well. Title 11, U.S.C., Sections 74 and 110; Henry Ansbacher & Company v. Klebanow, 2 Cir. 1966, 362 F.2d 569. A trustee is a person appointed by the court to manage the estate in the midst of the bankruptcy proceedings, to conserve the assets, and to put the business affairs of the bankrupt in sufficient order to facilitate the dissolution of the business and the distribution of assets to creditors and those holding equity interests. We think it significant that the trustee is under a duty to report to the United States Attorney any probable criminal violations of the bankruptcy act and to disclose to that official all relevant information. Title 18, U.S.C., Section 3057. In light of the strong governmental interest in protecting creditors in a bankruptcy situation a bankrupt would indeed be shortsighted if he did not perceive that many interested parties, governmental or otherwise, might be interested in examining the books of the bankrupt business. Reasonable expectations are that government officials will be examining the books.
 
 
 30
 Henzel v. United States, 5 Cir. 1961, 296 F.2d 650, is not inconsistent with the result reached here. A general levy had been made on the corporation of which Henzel was the sole shareholder and president. The corporate premises searched by the Postal authorities with permission of the sheriff were still maintained by Henzel as his daily working office, and it was clear that there was an improper invasion of an area in which he had a possessory interest at the time of the search. United States v. Kanan, 225 F.Supp. 711 (D.Ariz.1963), involved a search made with the permission of a receiver appointed under Arizona law. Because of the limited powers of a receiver under state law that case may be dismissed as not inconsistent with the result here reached, but even assuming that it is inconsistent, we choose not to adopt the Kanan reasoning. We also note with interest a recent article, 'Standing to Object to Search and Seizure', 118 University of Pennsylvania Law Review 333 (January 1970), which details some of the problems and legal inconsistencies which pervade this area of the law. Although arguing for a broader rule on the issue of standing, the authors acknowledge that the Supreme Court cases discussed above establish the law as it is today. Perhaps the suggestions contained in the article, which would give Cahn stronger grounds to claim standing here, merit consideration by the Supreme Court in some future case or controversy. We are of the view that the law as it now stands will not support Cahn's claim of standing. In view of this conclusion, we pretermit discussion of the question raised as to the bankruptcy trustee's authority to consent to the search.
 
 VIII.
 SUMMARY CHARTS
 
 31
 All of the appellants object to the admission of summary charts reflecting the disposition of funds by ABM and its affiliates. The charts were prepared from records of those companies by Securities and Exchange Commission examiners. The underlying records were marked for identification but were never introduced into evidence. The appellants urge that summaries may not be admitted when the records upon which they are based have not been introduced into evidence.
 
 
 32
 The weight of authority stands for the proposition that summaries prepared by an expert accountant of corporate records are admissible even though the records themselves are not admitted into evidence. Rather, it is required that the records must be available (ordinarily in court, unless too bulky and cumbersome) for the defendant's inspection. Bruce v. United States, supra; McDaniel v. United States, 5 Cir. 1965, 343 F.2d 785, cert. denied 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71; 4 Wigmore on Evidence, 3rd Ed., Section 1230.
 
 IX.
 PREJUDICIAL CLOSING ARGUMENT
 
 33
 Appellants Criswell and Hunt contend that it was error for the prosecutor to allude in his rebuttal closing argument to the failure of the appellants to call any investors to the stand. One of the defenses relied on by the appellants was that they had a good faith belief in the success of the company and tried to protect investors' funds, but the appellants presented no investor witnesses to testify that they had been dealt with fairly by the appellants. The prosecutor called this failure to the attention of the jury.
 
 
 34
 Smith v. United States, 5 Cir. 1956, 234 F.2d 385, states:
 
 
 35
 '* * * the rule against commenting on the failure of a defendant to testify in his own behalf 'does not go to the extent of forbidding argument by counsel for the prosecution to the effect that the evidence against a defendant is uncontradicted'. The same is true with respect to a failure to produce testimony on any phase of the defense upon which the accused seeks to rely'.
 
 
 36
 The prosecutor's comment was well within established limits of propriety.
 
 X.
 INSTRUCTIONS AS TO DOOD FAITH DEFENSE
 
 37
 The appellants Cahn and Kroll urge that the trial judge erred in refusing to give their proposed instructions on good faith. The appellee concedes that the defendants were entitled to have their defense of good faith squarely presented to the jury, but contends that the jury was fairly informed by the general instruction of the reliance on good faith as a defense. The appellee further asserts that the appellants failed to object to the charge given by the court, and that therefore here reversal can only be predicated on 'plain error' which they argue was not committed. See Rules 30 and 52(b), F.R.Crim.P. We agree with the government's position as to both points.
 
 
 38
 Even though a proposed charge is a proper statement of the law and the evidence warrants such a charge, a defendant is not necessarily entitled to have the charge presented to the jury in the exact words proposed so long as the substance of the proposition is fully and fairly conveyed to the jury. The charge ultimately given by the court was disclosed to counsel during a protracted charge conference the day before counsel argued the case to the jury. We set it out in the margin.[3] The appellants contend that the words 'any false representations by a defendant' led the jury to conclude that the good faith defense only applied to statements made by the defendants and not to actions of the defendants. They say that this was error of prejudicial proportions requiring reversal of their convictions.
 
 
 39
 Not so, in our judgment. The trial judge in his instructions fully covered the elements of each offense charged and the meaning of the words 'knowingly', 'willingly' and 'intent to defraud'. Moreover, each of the defendants took the stand and made it clear that he relied on his good faith as a defense, categorically denying malam fides or intent to defraud. The government maintains-- and we think with justice-- that in the overall context of the trial and the charges the jury was fairly presented with the good faith defense. See New England Enterprises, Inc. v. United States, 1 Cir. 1968, 400 F.2d 58, cert. denied 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581; Beck v. United States, 10 Cir. 1962, 305 F.2d 595. Perhaps the trial judge might have chosen words which would have more precisely conveyed that acts as well as words are included within a defense of good faith, but in a comprehensive view of this long trial (the record encompasses 4200 pages) the slight difference in nuance or accent pointed out is of minimal import. The defense was before the jury.
 
 
 40
 Further and of critical significance, we find the record bare of any objection by counsel for Cahn and Kroll to the charge as finally given by the trial judge. Before the jury began its deliberations, full opportunity to object (as contemplated by Rule 30, F.R.Crim.P.) was given, but no objection was voiced as to this phase of the instructions. Cahn's requested instruction No. 9 included a charge on good faith which covered acts as well as statements. Although a colloquy occurred during the charge conference between the trial judge and counsel for appellants Hunt and Adler over the wording of the good faith instruction which the judge proposed to give (R. 4001-4010), and finally gave, we find no indication that counsel for Cahn and Kroll joined in that discussion or made any objections to the court's proposed good faith instruction. Counsel was told that the court would 'think about' amending its own instruction covering good faith as a defense.
 
 
 41
 The following morning, just prior to the start of argument to the jury, the court went over with counsel several other matters reserved from the charge conference. Good faith as a defense was not again alluded to. No one pointed out to the court that this question had been reserved for further consideration. (R. 4056-4060) This failure to object occurred immediately following an explicit admonition from court to counsel that: 'Between now and the time that the jury is retired you are going to have to comply with the rules and specifically state the specific instruction to which you are objecting'. (R. 4055).
 
 
 42
 After completing his instructions to the jury, the court again gave counsel the opportunity to object to the charges contemplated by Rule 30, F.R.Crim.P. (R. 4127-37). The court specifically noted that each and every defendant had been given the benefit of an objection to those instructions which had been proposed and refused by the court during the charge conference, but was explicit in stating that specific objections were required to any charges given by the court and found objectionable. (R. 4128-29). The court further noted that while every defendant was allowed an objection as to those charges which he individually had requested and been refused, no party was given the benefit in the record of objections made by any other defendant. (R. 4130-31). The court restated its position by commenting that the requests to charge had not been made jointly, and would not be so considered for purposes of objections. (R. 4131). In the face of these repeated and rather laborious invitations to object and secure rulings, neither Cahn nor Kroll objected to the instructions as to good faith as a defense.
 
 
 43
 We have taken pains to relate these matters at some length in order to demonstrate the basis for our holdings: (1) that the point was not preserved for review by Cahn and Kroll, and (2) that we are not here justified in applying the 'plain error' rule. Rule 52(b), F.R.Crim.P.
 
 XI.
 SENTENCE CORRECTION
 
 44
 Kroll argues that he was subjected to an illegal sentence when the trial judge originally ordered five year concurrent sentences, and moments later changed the sentences so that two of the five year sentences would run consecutively. No error was committed. See Bozza v. United States, 330 U.S. 160, 67 S.Ct. 645, 91 L.Ed. 818 (1947); Williams v. United States, 5 Cir. 1970, 422 F.2d 1318; Vincent v. United States, 8 Cir. 1964, 337 F.2d 891, cert. denied 380 U.S. 988, 85 S.Ct. 1363, 14 L.Ed.2d 281.
 
 
 45
 We have carefully considered the record and briefs with respect to the claims of each appellant. Error in the trial and conviction is not demonstrated as to any appellant. The judgment appealed from is
 
 
 46
 Affirmed.
 
 
 
 *
 Honorable Orie L. Phillips of the Tenth Circuit, sitting by designation
 
 
 [1]
 Each of the seven appellants was convicted under seven counts of willful violation of Title 15, U.S.C., 77q(a) (use of the mails in furtherance of a scheme to defraud in the sale of securities), four counts of willful violation of Title 18, U.S.C., 1341 (use of the mails in furtherance of a scheme to defraud), and one count of violation of Title 18, U.S.C., 371 (conspiracy)
 
 
 [2]
 At least twenty-five grounds of error are asserted by one or more appellants. This opinion will take up and dispose of what we consider to be the eleven most serious grounds. The other fourteen which we record below simply to indicate that they have not been overlooked, are found completely without merit and not warranting discussion here. Some border on the frivolous. These grounds are:
 (1) Inflammatory prosecutorial remarks. (2) Admission into evidence of pre-September 1959 Expenditures. (3) Admission of testimony of investors not named in the indictment. (4) Improper cross-examination of defendant Adler. (5) Prejudicial response of government's investor witness. (6) Improper hypothetical question posed by trial judge. (7) Introduction of Exhibit 508. (8) Length of trial prejudicial. (9) Introduction of hearsay evidence. (10) Variance between proof and indictment. (11) Improper instruction with regard to the use of the mails. (12) Denial of appellants' requested instruction in answer to jury's request for additional instruction. (13) Refusal to give appellant Kroll's requested stock ownership instruction. (14) Refusal to give appellants' requested instruction on reliance upon advice of counsel.
 
 
 [3]
 The portion of the charge in dispute was given as follows:
 'As to counts 1 through 8, 11, 13, and 14 of the indictment, any false representations made by a defendant must have been known by him to be false. A good faith belief in the truth of statements made is a complete defense to the charges of fraudulent misrepresentations.' (R. 4110-11).