

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ROGER EVAN GARRETT, | § | No. 08-13-00323-CR |
| Appellant, | § | Appeal from |
| v. | § | 168th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 20130D01613) |
| | § | |

## **O P I N I O N**

Roger Evan Garrett appeals his conviction of murder. A jury found Appellant guilty and assessed his punishment at a $5,000 fine and imprisonment for a term of forty years. For the reasons that follow, we affirm.

### **FACTUAL SUMMARY**

In January of 1977, Lisbeth Garrett (Lisbeth) lived in El Paso with her two sons, eighteen-year-old Roger Garrett (Appellant), and twelve-year-old Patrick Garrett (Patrick). Lisbeth and her husband, Major Chester Garrett, were divorcing and Lisbeth had learned that Chester was in a relationship with another woman. Chester was living at the Bachelor Officers Quarters (BOQ) on Fort Bliss. He was a large, athletic man in superb physical condition and he held a black belt in karate. On the evening of January 3, 1977, Lisbeth asked Patrick if he wanted to go see a movie. Patrick thought this was unusual because it was a school night and he

normally had to be in bed by 8:30 or 9:00. Lisbeth drove Patrick and a friend, Buddy Larson, to the theater, but she did not return to pick them up when the movie ended at 9:30. They called Larson's mother who picked them up and dropped off Patrick at his home. The house was completely dark and Patrick was unable to get in the house because he did not have a key and no one came to the door. He walked down the street to the Larsons' house to use the telephone to call home, but no one answered. Patrick remained at Larson's house until he saw the porch light on at his house. When he arrived home, Appellant opened the door and Patrick noticed that the house was completely dark except for the porch light. Appellant "corralled" Patrick into his bedroom and told him to go to bed because it was a school night. The next morning when Patrick woke up, Appellant was standing in his bedroom with a bowl of cereal which he made Patrick eat in his bedroom. Even though Patrick normally showered before going to school, Appellant made him go to school without a shower. Appellant picked up Patrick from school that afternoon and told him that there had been an accident and their father was dead. On the morning of January 4, 1977, Chester's body was found in the backseat of his red Volkswagen. The vehicle was parked off of Loop 375 on the east side of El Paso. Chester had died as the result of blunt force trauma to the head and multiple stab wounds to the body. Dr. Juan Contin, the chief medical examiner for El Paso County, testified that Chester had suffered two blows to the back of the skull and two blows to the front which caused multiple contusions to the brain. Chester also had seven stab wounds to the chest and flank. In Dr. Contin's opinion, the stab wounds to the chest and the head injuries were fatal. At around 3 p.m. that same day, Glenn Hall, who was the corporal commander of the student battalion at the Air Defense School at Fort Bliss, went to the Garrett home to notify the family. Lisbeth and Appellant were present and Hall noticed that they were wearing matching bathrobes which he found strange. Hall

characterized their reaction to the news of Chester's death as "fairly stoic." He was aware that Chester and Lisbeth had a bitter relationship at the time and he immediately assumed that she was "a very likely suspect" in Chester's murder.

On the evening of January 4, 1977, Deputy Jesus Reyes and other investigators went to Chester's quarters at the BOQ. The lights were on, nothing had been disturbed, and the quarters appeared to be just as Chester had left it. Reyes noted that there was a half-eaten sandwich and half a can of Mountain Dew soda on Chester's desk. That same evening, Reyes also attempted to process the Garrett home for evidence but Lisbeth was uncooperative and did not consent to a search of the home. About a week after Chester died, Appellant made Patrick help him clean out the garage. They used muriatic acid to clean stains off of the left side of the garage floor and Appellant washed the residue out of the garage with a hose.

On January 13, 1977, Lisbeth finally consented to a search of the home. Reyes observed a large chalky stain on the driveway coming underneath the garage door and from inside of the garage. It appeared as though something had been washed out of the garage. Inside of the garage, Reyes found a bottle of muriatic acid and the left side of the garage appeared to have been recently cleaned because it was still wet. Reyes also saw what appeared to be blood spatter on the garage wall.

Appellant testified before the grand jury on January 13, 1977 and admitted he had seen Chester at the Garrett home on the evening of January 3, 1977. Patrick was not there because they had dropped him off at the theatre. Chester spoke privately with Lisbeth while Appellant shot the basketball outside. According to Appellant, Chester and Lisbeth walked out of the house and Chester drove away in his car that evening. Appellant and Lisbeth were aware that Chester was dating Jennifer Molina but denied that Chester and Lisbeth were not getting along

during the divorce. To the contrary, Appellant insisted that his mother had accepted the situation. The grand jury no-billed Appellant on January 13 or January 14, 1977 and Chester's death became a cold case.[1] Law enforcement did not discover for many years that Appellant subsequently confessed to friends and family members that he and Lisbeth had murdered Chester.

*Appellant's 1978 Confession to Debra Rodriguez*

Debra Rodriguez met Appellant in the summer of 1978 when she was in her sophomore year of high school and they became friends. Appellant wanted to date Rodriguez but she was not interested in him. In late October or early November 1978, Rodriguez and Appellant were drinking beer alone in a park and Appellant began talking about his father. Appellant said there was something weighing heavily on him and he was going to tell her a "deep, dark secret." Appellant, who was crying and upset, said that his mother told him Chester had been beating and abusing her and she asked Appellant to kill him. Appellant explained that Chester was extremely fit so they needed the element of surprise to succeed. Appellant and Lisbeth first thought about shooting Chester during his daily run, but they abandoned that plan. They instead decided to lure Chester to a location where he could be surprised and knocked unconscious so he would be unable to defend himself. Appellant told Rodriguez that he hid in a linen closet or washroom until Chester's back was to him and he then knocked Chester unconscious by striking him in the back of the head with a large piece of wood like a baseball bat or two-by-four. Rodriguez recalled Appellant stating that they also stabbed Chester with a knife "to finish the job" but she was unsure whether it was Appellant or Lisbeth who stabbed Chester. Appellant and Lisbeth put Chester's body in his car and drove the car out to a remote desert area of El Paso, but she was not sure whether it was on the east or west side of El Paso. Rodriguez asked Appellant why he was

---

[1] The jury was not made aware of the results of the grand jury proceeding.

not in jail for the murder and Appellant replied that they had been suspects but the police did not have any evidence against them. Appellant explained to Rodriguez that they cleaned the blood out of the garage using chemicals and he was surprised that none of the neighbors had noticed the residue as it ran out of the garage into the street because it was a strange color. Rodriguez did not report the story to the police because she did not believe one of her friends could have done such a thing and she thought Appellant was just telling her a story to get closer to her. She left El Paso for approximately a year and she lost contact with Appellant until 1991.

*Appellant's 1990 Confession to Patrick Garrett*

In December 1990, Patrick and his wife, Jeanne, were living with Lisbeth. Patrick and Appellant were sitting on a bench on the porch. Lisbeth was not present during this discussion. Patrick told Appellant that he was thinking about joining the Army because he thought a war was coming and he wanted to serve his country like their father had done. Appellant replied that "guys get killed doing that" and the conversation turned to their father. Patrick then asked if there was anything Appellant wanted to tell him about their father. Patrick recalled that Appellant's "whole demeanor" changed and he placed his arm around Patrick and confessed that he and Lisbeth had murdered Chester. Appellant told Patrick that they sent him to the movies that night to get him out of the house. They called Chester and told him that the dishwasher needed to be fixed. Before Chester arrived, Appellant placed a bat in the dining room. When Chester leaned over the dishwasher to see what was wrong with it, Appellant came up behind him with the bat and struck Chester's head as hard as he could. Lisbeth then stabbed Chester repeatedly with a knife. They dragged Chester into the garage and when Chester began gasping for air and gurgling, Lisbeth took the bat from Appellant and crushed Chester's head with it. Appellant and Lisbeth put Chester in his Volkswagen and drove him out to a street on the far east

side of El Paso and left him in the car.[2] They disposed of the evidence by putting their clothes, the baseball bat, and the knife in separate plastic bags and throwing them away in trash bins at different convenience stores on the west side of El Paso. Patrick did not call the police because he could not bring himself to turn in his family, but Patrick told the story to his wife, Jeanne, and to his father-in-law.

Jeanne was at the house the day Appellant confessed to Patrick. She recalled that Patrick had questions about Chester's murder and had read articles about it at the library. Patrick approached Appellant and asked him about Chester's murder. Lisbeth arrived later while they were talking and they got into an argument. When Lisbeth stated that she had raised a bunch of idiots, Appellant replied, "No, you've raised a bunch of killers." Patrick and Appellant went outside onto the front porch.

*Appellant's 1991 Confession to Theresa Heffelfinger*

Appellant and Rodriguez resumed their friendship in 1991 and Rodriguez introduced him to one of her friends, Theresa Heffelfinger. Rodriguez did not tell Heffelfinger about Appellant's confession to her because she still did not believe it. Appellant and Heffelfinger married on April 18, 1992.

Heffelfinger testified that Appellant spoke to her about Chester's murder, but he believed Chester had been attacked by a gang while jogging. In August 1992, they had a major argument and she brought up the subject of divorce. Appellant broke down and confessed to her that he and Lisbeth had murdered Chester. Lisbeth and Chester were separated and their arguments had become physical. Lisbeth convinced Appellant that her life was in danger and she told Appellant they could not go to the police. On the day of the murder, they arranged for Patrick to be at a friend's house and they induced Chester to come over to the house. Appellant told Heffelfinger

---

[2] Patrick testified that Appellant and Lisbeth drove Chester's car out to "Avenue of Americas."

that they had to catch Chester "unaware". Appellant struck Chester with a baseball bat in the kitchen and Chester asked him, "Why are you doing this?" Lisbeth became enraged and stabbed Chester. They dumped Chester's body in east El Paso and cleaned up the evidence at the house. They got rid of the knife and their clothing and changed the tires on their car. Heffelfinger believed Appellant but she did not call the police because she felt threatened by Appellant's statement that Lisbeth could never know that he had confessed to her. He also told her that the authorities did not have evidence to prove they had murdered Chester. Heffelfinger and Appellant divorced in 1993.

*Heffelfinger and Patrick are Interviewed*

In September 1995, Patrick's wife, Jeanne, called Heffelfinger. Heffelfinger told Jeanne what Appellant had confessed to her about the murder. The police subsequently contacted Heffelfinger and she gave them a statement. Detectives from the El Paso County Sheriff's Department contacted Patrick when he was in jail in Missouri in 1995 for interference with child custody because he had taken his children without Jeanne's permission. Patrick denied that Appellant had made any confession to him. He was interviewed again in 2006 and continued to deny that Appellant had confessed to the murder. Patrick explained at trial that he could not bring himself to turn in his family to the police.

*Patrick Has a Change of Heart*

In January of 2013 near the anniversary of the murder, Patrick contacted the Sheriff's Department and reported that Appellant had admitted to him that he and Lisbeth had murdered Chester.[3] Patrick explained that his sixteen-year-old son died of cancer in 2009 and he had since become a Christian. He believed that if he did not come forward he would be just as guilty of the murder as Appellant and Lisbeth. Prior to contacting the Sheriff's Department, he spoke

_____
[3] Patrick's written statement is dated January 5, 2013.

with both Appellant and his mother and tried to convince them to turn themselves in to the police, but they refused.

*Impeachment of Patrick*

On cross-examination, Patrick admitted that he was unemployed had been living with Lisbeth in El Paso. According to Patrick, he and Lisbeth had an agreement that she would handle the finances in exchange for his work on her house. He ceased living with Lisbeth on January 4, 2013, the day before he gave his statement to the Sheriff's Department. Patrick also admitted that he had registered the business name, "Hire a Liar." He explained that there is an existing franchise business with that name and the company would be required to pay him a fee if it ever attempted to open a franchise in El Paso. The defense questioned Patrick about emails sent from his email address claiming that he had been in a facility known as The Underground in Carthage, Missouri and seen two alien, reptilian creatures. Patrick denied sending those emails. Appellant's stepdaughter, Christine Myerson, testified that Patrick told her in 2010 that he believed the president is an alien reptilian shape-shifter and he had seen reptilian creatures in an underground storage facility in Carthage, Missouri.

*The Defense Case*

Robert Snelson testified that he and Appellant were good friends in 1977 and he lived about four blocks from Appellant. Appellant came to his house on January 3, 1977 to help him write a paper for his English class. Snelson had a vague memory of the day's events and he recalled only that Appellant had been at his house in the evening. He reviewed three written statements he had given to the Sheriff's Department in relation to the case but they did not help refresh his memory. The defense introduced two of those statements into evidence. In the statement given on January 18, 1977, Snelson stated that Appellant came to his house on

January 3, 1977 at 11:00 a.m. to help him with an English paper and he stayed until about 3:00 that afternoon. Appellant told Snelson that he would come back later. Sometime between 7:30 and 9:00 that night, Appellant, who was wearing a red, white, and blue warmup suit, stopped at Snelson's house and told him that he had to take Patrick somewhere and to call him at 10:00. Appellant was driving his mother's Mercury. Snelson called the Garrett residence at 10:00 and Lisbeth answered. She said that Appellant had gone to get Patrick and she would have him call Snelson when he returned. Appellant called Snelson at 10:15 or 10:30 and invited him to come over to the Garrett residence to finish the paper but Snelson's father would not let him leave the house. Appellant drove to Snelson's house in the Mercury and he was wearing the same warmup suit. They worked together on the paper until about 12:30 a.m.

Christine Ceniceros is a forensic scientist employed by the Texas Department of Public Safety Crime Lab. Tests were performed to compare a partial DNA profile obtained from swabs of the steering wheel of the victim's Volkswagen with the DNA of Chester and Appellant. Appellant and Chester were excluded as the contributors of that partial DNA profile. Likewise, a hair found on the bottom right portion of the passenger seat did not match Appellant.

Sharon Turner testified she and Chester had been dating for several months prior to his death. They did not see each other on January 3, 1977 but Chester called her at 8:00 or 8:30 p.m. and they talked for 15 to 20 minutes. He told her he had gotten a promotion to lieutenant colonel and he wanted Sharon and her children to move to Italy with him.

Appellant testified at trial and denied murdering Chester or telling anyone that he had killed his father. He specifically denied confessing to Rodriguez, Heffelfinger, or Patrick that he had killed Chester. Consistent with Snelson's first written statement, Appellant said that he went to Snelson's house at 11:00 a.m. on January 3, 1977 to help him with an English paper. Snelson

had not done any work on the paper and Appellant refused to write it for him. Appellant explained in detail what Snelson needed to do and he helped him create an outline for the five paragraph essay. Before leaving at around 2:30 or 3:00 that afternoon, Appellant told Snelson that Patrick was going to a movie and Chester was going to come over to the house, so he would return later that evening to help Snelson finish his paper.

Appellant and Lisbeth drove Patrick and his friend to the theater, but he stopped at Snelson's house on the way and told him that he would return at 9:30 or 10:00 to help him with the paper. Appellant and Lisbeth dropped off Patrick and Larson at the theater in time for them to make the 7:30 showing. Appellant recalled that he stopped by Snelson's house at around 7:10 or 7:15 and he told Snelson to call him later. After returning home, Appellant played basketball for a while. He lost track of time and did not leave the house to pick up Patrick and Larson from the movies until 9:30 or 9:35. He could not find them at the theater and he returned home at around 10:00. The house was completely dark and his mother was in bed. About five minutes after he turned on the porch light, Patrick came home from the Larsons' house. He sent Patrick straight to bed because it was a school night. Appellant called Snelson and invited him to come over to finish his paper, but Snelson's father would not let him go. Appellant went to Snelson's house and stayed until about 1:00 a.m.

The following day, Lt. Colonel Hall came to the house and notified them that Chester was dead. When Appellant began crying, Hall told him that he needed to be a man and Chester was not even his real father. Appellant recalled that his mother decided they needed to move. He explained that the neighbors, who they had never met, brought food and asked what had happened but they did not say they were sorry for the Garretts' loss or that they would help if Appellant needed to talk. Appellant told her he did not like the neighbors and they should move.

Lisbeth told Appellant and Patrick to clean the garage floor because it had oil and transmission fluid on it. Appellant used muriatic acid to clean the floor because that was how his father had taught him. They started with the left side because it had more stains but they were interrupted and did not do the right side until later.

On cross-examination, Appellant admitted that he never contacted the Sheriff's Department to find out the status of the investigation into his father's murder nor did he maintain contact with his father's sisters after 1977. Appellant admitted he did not have an alibi for 7:10 p.m. to 10:30 p.m. on the night of January 3, 1977.

## SUFFICIENCY OF THE EVIDENCE

In Issue One, Appellant challenges the legal sufficiency of the evidence supporting his conviction. More specifically, he asserts that the evidence is insufficient to prove identity.

### *Standard of Review and Relevant Law*

In reviewing the sufficiency of the evidence to determine whether the State proved the elements of the offense beyond a reasonable doubt, we apply the *Jackson v. Virginia* standard. *Brooks v. State*, 323 S.W.3d 893, 895-96 (Tex.Crim.App. 2010), *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under that standard, a reviewing court must consider all evidence in the light most favorable to the verdict and in doing so determine whether a rational justification exists for the jury's finding of guilt beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 894-95, *citing Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX.CODE CRIM.PROC.ANN. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Dobbs*, 434 S.W.3d at 170. When reviewing sufficiency of

the evidence, we are not permitted to reevaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010). Our task is to determine whether, based on the evidence and reasonable inferences drawn therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

In our review, we consider both direct and circumstantial evidence and all reasonable inferences that may be drawn from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). The standard of review is the same for both direct and circumstantial evidence cases. *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex.Crim.App. 2010); *Arzaga v. State*, 86 S.W.3d 767, 777 (Tex.App.--El Paso 2002, no pet.). Each fact need not point directly and independently to the guilt of the accused, so long as the cumulative force of all the evidence, when coupled with reasonable inferences to be drawn from that evidence, is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004); *Arzaga*, 86 S.W.3d at 777.

The indictment alleged that Appellant intentionally or knowing caused Chester Garrett's death by striking him with a baseball bat (Paragraph A) or by stabbing him with a knife (Paragraph C), or Appellant, with the intent to cause serious bodily injury, committed an act clearly dangerous to human life and caused the death of Chester Garrett by striking him with a baseball bat (Paragraph B) or by stabbing him with a knife (Paragraph D). Thus, the indictment charged Appellant with murder under Section 19.02(b)(1) and (b)(2) of the Texas Penal Code. TEX.PENAL CODE ANN. § 19.02(b)(1)-(2) (West 2011). The court's charge instructed the jury on

the law of parties and the application paragraph permitted the jury to find Appellant guilty as either a primary actor or as a party.

The State must prove beyond a reasonable doubt that the accused is the person who committed the charged offense. *Miller v. State*, 667 S.W.2d 773, 775 (Tex.Crim.App. 1984). Identity may be proven by direct evidence, circumstantial evidence, or even inferences. *Wiggins v. State*, 255 S.W.3d 766, 771 (Tex.App.--Texarkana 2008, no pet.); *Roberson v. State*, 16 S.W.3d 156, 167 (Tex.App.--Austin 2000, pet. ref'd).

*Review of the Evidence*

We begin by examining the evidence supporting Appellant's conviction as the principal actor. As noted by the State, Appellant incorrectly characterizes the evidence against him as entirely circumstantial. Three witnesses testified that Appellant confessed to them that he and his mother killed the victim by hitting him with a baseball bat and stabbing him with a knife. It is well established that proof the defendant admitted or confessed to killing the deceased is direct, not circumstantial evidence. *Ridyolph v. State*, 545 S.W.2d 784 (Tex.Crim.App. 1977); *see Barefoot v. State*, 596 S.W.2d 875, 880 (Tex.Crim.App. 1980). Further, an extrajudicial confession alone is sufficient to establish the identity of the perpetrator of a crime. *Emery v. State*, 881 S.W.2d 702, 706 (Tex.Crim.App. 1994); *Gribble v. State*, 808 S.W.2d 65, 70 (Tex.Crim.App. 1990).

Appellant urges the court to completely disregard the extrajudicial confessions because the three witnesses lack credibility, but the standard of review does not permit us to act as a thirteenth juror or substitute our judgment for that of the fact finder. It was the jury's task to evaluate the credibility of these witnesses, weigh all of the evidence, and draw inferences from the evidence, and we must defer to the jury's determination in these matters. Thus, the

extrajudicial confessions alone are sufficient to prove Appellant's identity as the perpetrator of his father's murder.

Even though the State was not required to corroborate the extrajudicial confessions with respect to Appellant's identity as the perpetrator of the offense, there is evidence which does just that.[4] First, it is undisputed that Appellant and Lisbeth were at home alone when Chester came to the residence that evening. Patrick had gone to a movie even though it was a school night. Appellant testified before the grand jury that he and Lisbeth were home when Chester came by that evening. Second, there is evidence that Chester left his quarters suddenly because the lights were on and he left a half-eaten sandwich on the table. This is consistent with Appellant's statements that he and Lisbeth lured Garrett to the house on the pretext that the dishwasher was broken. Third, there is evidence that the murder took place at the Garrett residence on the evening of January 3, 1977. Neither Lisbeth nor Appellant picked up Patrick and his friend at the theater and the boys had to call Larson's mother for a ride. When Larson's mother dropped Patrick off at the house, it was completely dark and no one answered the door. He returned home later and the house was still dark except for the porch light. Appellant made Patrick go straight to his bedroom, and the following morning Appellant made Patrick eat breakfast in his bedroom and go to school without a shower. The jury could have inferred that Appellant was trying to prevent Patrick from seeing any evidence of the murder in the house. Both Lisbeth and Appellant were uncooperative and Lisbeth did not consent to a search of the house until more than a week after the murder. In the meantime, Appellant, at the direction of his mother, cleaned the garage floor with muriatic acid. The jury could have concluded that Appellant was

---

[4] In Texas, an extrajudicial confession of the accused is insufficient to support conviction unless it is corroborated by independent evidence tending to show that a crime was committed. *Gribble*, 808 S.W.2d at 70. It need not be corroborated as to the person who committed it, since identity of the perpetrator is not a part of the corpus delicti and may be established by an extrajudicial confession alone. *Id.*

destroying any evidence of the murder on the garage floor. Fourth, the location where Chester's vehicle and body were found was consistent with what Appellant had told Rodriguez, Patrick, and Heffelfinger. We conclude that a rational trier of fact could have found beyond a reasonable doubt that Appellant was the perpetrator of the murder of Chester Garrett. *See Emery*, 881 S.W.2d at 706 (holding a defendant's extrajudicial confessions sufficient to establish his identity where three such confessions in evidence gave certain details of the offense). It is unnecessary to address the sufficiency of the evidence supporting Appellant's conviction as a party. Issue One is overruled.

## MEDICAL EXAMINER'S TESTIMONY

In Issue Two, Appellant argues that the trial court erred by allowing the medical examiner to testify from an autopsy report which he did not author. Citing *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 1369, 158 L.Ed.2d 177 (2004) and *Burch v. State*, 401 S.W.3d 634, 635-37 (Tex.Crim.App. 2013), he maintains that the forensic autopsy report is testimonial and the admission of its contents violated the Confrontation Clause.

The trial took place thirty-six years after the autopsy of Chester Garrett. The autopsy report was not admitted into evidence. The medical examiner, Dr. Contin, reviewed the file and autopsy report and examined the photographs related to the autopsy. He described Chester's injuries and stated his expert opinion regarding the cause of death.

### *Standard of Review*

We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex.Crim.App. 2010); *McDonald v. State*, 179 S.W.3d 571, 576 (Tex.Crim.App. 2005). When deciding whether the admission of certain statements violated a defendant's right to confrontation, we review the trial court's ruling *de*

*novo*. *Wall v. State*, 184 S.W.3d 730, 742-43 (Tex.Crim.App. 2006).

*No Confrontation Clause Violation*

The Confrontation Clause of the Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses. U.S. CONST. amend. VI; *Langham v. State*, 305 S.W.3d 568, 575 (Tex.Crim.App. 2010). In *Crawford v. Washington*, the Supreme Court held that the Confrontation Clause bars out-of-court statements that are testimonial, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 59, 124 S.Ct. at 1369. The Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. *Williams v. Illinois*, --- U.S. ---, 132 S.Ct. 2221, 2235, 183 L.Ed.2d 89 (2012); *Crawford*, 541 U.S. at 59 n.9, *citing see Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985). In *Williams v. Illinois*, the Supreme Court observed that the rules of evidence permit an expert to express an opinion that is based on facts that the expert assumes, but does not know, to be true. *Id.*, --- U.S. ---, 132 S.Ct. at 2228. Further, the expert may explain the facts on which his or her opinion is based without testifying to the truth of those facts. *Id.* The Supreme Court held that out-of-court statements related by an expert solely for the purpose of explaining the assumptions on which the expert's opinion rests are not offered for their truth and fall outside the scope of the Confrontation Clause. *Id.*, --- U.S. ---, 132 S.Ct. at 2228.

In *Gomez v. State*, No. 08-12-00001-CR, 2014 WL 3408382 at *6 (Tex.App.--El Paso 2014, no pet.), we applied *Williams* to the same situation as presented here. There, Dr. Contin testified as an expert after he utilized an autopsy report prepared by another medical examiner, Dr. Paul Shrode, and reviewed the autopsy photos. Dr. Contin testified regarding his expert

opinion that each victim's cause of death was a gunshot wound to his head. Citing *Williams v. Illinois*, we held that there was no Confrontation Clause violation because the statements in the autopsy reports on which Dr. Contin based his expert opinion were not offered for the truth of the matter asserted. *Gomez v. State*, No. 08-12-00001-CR, 2014 WL 3408382 at *7-8. The same analysis and conclusion applies in this case. The statements in the autopsy report were not offered for the truth of the matter asserted but they instead formed the basis of Dr. Contin's expert opinion regarding cause of death. Finding no Confrontation Clause violation, we overrule Issue Two.

## PRE-INDICTMENT DELAY

In Issue Three, Appellant contends that the trial court erred by denying his motion to dismiss based on pre-indictment delay. Prior to trial, Appellant moved to dismiss the indictment on the ground that the pre-indictment delay of more than thirty-six years violated his right to Due Process. After a hearing, the trial court denied the motion. Appellant did not ask the trial court to make findings of fact and conclusions of law.

### Standard of Review and Relevant Law

When reviewing a trial court's ruling on a motion to dismiss due to pre-indictment delay, we apply a bifurcated standard of review. *State v. Krizan-Wilson*, 354 S.W.3d 808, 815 (Tex.Crim.App. 2011). Under this standard, we give almost total deference to a trial court's findings of fact that are supported by the record, as well as any mixed questions of law and fact that rely upon the credibility of witnesses. *Id*. We apply a *de novo* standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Id*.

Statutes of limitations are the primary guarantee used to protect citizens from stale criminal charges that impair those citizens' abilities to defend themselves, but they are not the

only redress because the Due Process Clause provides additional protection from "oppressive delay." *Krizan-Wilson*, 354 S.W.3d at 813-14. There is no statute of limitations for murder. TEX.CODE CRIM. PROC.ANN. art. 12.01(1)(A) (West 2015). A defendant is entitled to relief for pre-indictment delay under the Due Process Clause when he shows that the delay: (1) caused substantial prejudice to his right to a fair trial, and (2) was an intentional device used to gain a tactical advantage over the accused or for some other bad-faith purpose. *Krizan-Wilson*, 354 S.W.3d at 814-15. There must be proof of both elements. *Id*. at 814.

*The Evidence*

Kyle Myers is one of the assistant district attorneys who prosecuted this case at the trial in 2013 and he testified at the hearing on Appellant's motion to dismiss due to pre-indictment delay. It is undisputed that the investigation into Chester's murder began on January 4, 1977 with the discovery of his body. The case against Appellant was presented to the grand jury on January 13 or January 14, 1977 and the grand jury no-billed him. The case went cold until late 1995 when the Sheriff's Department learned that Appellant had made inculpatory statements to Heffelfinger and Patrick.

Heffelfinger gave a written statement to the Sheriff's Department on November 2, 1995 stating that Appellant had confessed to her that he murdered Chester. Jeanne Patterson also gave a written statement indicating that Patrick told her that Appellant had confessed to him that he murdered his father. Patrick, however, denied that Appellant made any confession to him and the case went cold again.

The investigation was renewed in 2006 when Chester's sister, Jackie Connor, called the Sheriff's Department and told investigators that Patrick had told her family that Appellant had admitted to him that he murdered Chester. When Patrick was interviewed, however, he again

denied that Appellant had made any inculpatory statements to him. The District Attorney's Office determined that probable cause to arrest Appellant did not exist unless Patrick admitted that Appellant had confessed to him.

On January 5, 2013, Patrick called the Sheriff's Department and finally gave a statement admitting that Appellant had confessed to him that he and Lisbeth murdered Chester. The Sheriff's Department interviewed Heffelfinger again on January 23, 2013. Myers testified that it was not until February 2013 that the prosecutors felt they had probable cause to arrest both Appellant and Lisbeth for Chester's murder. The critical factor in the probable cause decision was that Patrick's statement was consistent with Heffelfinger's statement.

On cross-examination, Appellant asked Myers to identify the potential witnesses who had died prior to trial. Myers identified Lt. Gary Gabbert who led the investigation and interviewed Patrick in 1996, Wallace Brown, and two crime scene investigators, R. J. McCrea and Jose Luis Garola. Other than cross-examining Myers, the defense did not produce any evidence at the hearing.

*Substantial Prejudice*

Citing *Gonzales v. State*, 435 S.W.3d 801 (Tex.Crim.App. 2014), Appellant first argues that prejudice must be presumed. In *Gonzales*, a speedy trial case under the Sixth Amendment, the Court of Criminal Appeals found that a delay of six years is presumptively prejudicial. *Id.* at 809. The court held that Speedy Trial Clause is limited to an accused and a person who has not been formally charged cannot seek its protection. *Id.*, 435 S.W.3d at 808, *citing United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The court further stated that "[a]ny delay between commission of the crime and indictment is controlled by the applicable statute of limitations." *Id., quoting Kroll v. United States*, 433 F.2d 1282, 1286 (5th Cir. 1970).

- 19 -

Appellant reasons that prejudice must be presumed because there is no statute of limitations for murder. *Gonzales* is inapplicable here because the issue before us involves the Due Process Clause of the Fifth Amendment, not the Sixth Amendment's Speedy Trial Clause. Further, relevant authority indicates that prejudice may not be presumed.

In *United States v. Marion*, 404 U.S. at 322, 92 S.Ct. at 464, the United States Supreme Court explained that statutes of limitation represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice. Statutes of limitation provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced. *Id.* Quoting its decision in *Toussie v. United States*, 397 U.S. 112, 114-115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970), the Court further stated:

> The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.

*Marion*, 404 U.S. at 322-23, 92 S.Ct. at 464-65.

In *Krizan-Wilson*, the Court of Criminal Appeals observed that "[f]or the offense of murder, the Texas legislature has intentionally chosen not to define a statute of limitations, explicitly allowing prosecutors to indict suspected murderers when they are ready to do so, and has determined that any such delay, without more, does not offend the community's sense of fair play and decency." *Krizan-Wilson*, 354 S.W.3d at 820. We conclude that Appellant was required to show actual prejudice in order to establish a due process violation. *See United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2048-49, 52 L.Ed.2d 752 (1977), *citing Marion*,

404 U.S. at 324-325, 92 S.Ct., at 465.

The record of the dismissal hearing shows that four potential witnesses died during the delay. There is no evidence in the record regarding the content of their testimony. Consequently, Appellant did not show that their testimony would have been beneficial to his defense. Appellant additionally argues in his brief that the medical examiner who performed the autopsy was deceased at the time of trial. Appellant did not present any evidence regarding this witness at the hearing. Further, the record does not show how this witness's testimony would have benefitted the defense. We conclude that Appellant did not carry his burden of establishing actual prejudice resulting from the pre-indictment delay.

*Was the Indictment Delayed to Gain a Tactical Advantage?*

Even if we agreed with Appellant that the lengthy delay is presumptively prejudicial, we may not infer bad faith from the existence of delay and prejudice. *Krizan-Wilson*, 354 S.W.3d at 818. Appellant argues that he proved that the prosecution intentionally delayed indictment in order to gain a tactical advantage or for some other bad faith purpose because the evidence showed that probable cause existed to arrest Appellant in 2006. The Court of Criminal Appeals observed in *Krizan-Wilson* that the State is not required to conduct a continuous investigation. *Krizan-Wilson*, 354 S.W.3d at 818-19, *citing Ibarra v. State*, 11 S.W.3d 189, 193-94 (Tex.Crim.App. 1999). Likewise, "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." *Krizan-Wilson*, 354 S.W.3d at 819, *quoting U.S. v. Lovasco*, 431 U.S. 783, 791, 97 S.Ct. at 2049. There is no evidence in the record from which it can be concluded that the delay was an intentional device used to gain a tactical advantage or for some other bad faith purpose. The evidence instead shows that probable cause to arrest likely did not

exist until 2006 and the subsequent delay resulted from the prosecutors' decision to continue the investigation until they could obtain a statement from Patrick. There is a distinction between prosecutorial delays for investigatory purposes and delays for the purpose of gaining a tactical advantage over the accused. *Krizan-Wilson*, 354 S.W.3d at 820, *citing Ibarra*, 11 S.W.3d at 194 and *Lovasco*, 431 U.S. at 795, 97 S.Ct. at 2051. Because Appellant has failed to show that the State delayed indictment in order to gain a tactical advantage or for some other bad faith purpose, we conclude that the trial court did not err by denying the motion to dismiss. Issue Three is overruled.

### JURY ARGUMENT

In his final issue, Appellant contends that the prosecutor's improper jury argument at guilt-innocence deprived Appellant of his right to a fair trial. During closing argument, defense counsel argued that the State's entire case rested solely on the testimony of three interconnected people, Rodriguez, Heffelfinger, and Patrick, and he vigorously challenged the credibility of each of them. He characterized Patrick as a liar, a con man and the driving force behind the case. Defense counsel asserted that Patrick became angry and went to the police because Appellant and Lisbeth stopped supporting him financially. In response, the prosecutor argued that Jeanne Patterson had no motive to lie or frame Appellant and she corroborated Patrick's testimony. The prosecutor then made the following argument:

> [Prosecutor]: So then what else does Jeanne Patterson tell you, who has no motive to get in on this conspiracy to convict an innocent man? *She tells you after the conversation on the porch, Patrick comes back into the bedroom. And because of the rules of evidence, she can't say what he told her, but she can say they talked, they talked about it and how his demeanor was, that he was upset, crying and that he had learned what had happened.* [Emphasis added.]

> [Defense counsel]: Your Honor, I'm going to object. That's an improper argument.

- 22 -

[The Court]:  Sustained.

[Defense counsel]:  Instruction to disregard.

[The Court]:  I'm going to ask the jurors to just disregard the comment regarding the rules of evidence.   Go ahead.

[Defense counsel]: Move for mistrial, Your Honor.

[The Court]:  Denied.

[Prosecutor]:  She told you that he came back in, that they talked and that he was clearly visibly upset.  And Patrick Garrett told you that is when he told his wife what his brother had just told him, all of it.  All of these little pieces continue to be corroborated either because this is the greatest conspiracy ever or it's because it's the truth.

*Standard of Review and Relevant Law*

The trial court sustained Appellant's objection to the highlighted argument and instructed the jury to disregard it.  Consequently, the issue on appeal is whether the trial court abused its discretion by denying the motion for mistrial.  *See Archie v. State*, 221 S.W.3d 695, 699 (Tex.Crim.App. 2007).  If the ruling falls within the zone of reasonable disagreement, it must be upheld.  *Id.*  A mistrial is warranted only in extreme circumstances where the prejudice is incurable.  *Id.*

Generally, there are four proper areas of jury argument:  (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answers to an argument of opposing counsel; and (4) pleas for law enforcement.  *Freeman v. State*, 340 S.W.3d 717, 727 (Tex.Crim.App. 2011).  It is well established that a prosecutor may not use closing argument to get evidence before the jury that is outside the record and prejudicial to the accused.  *Borjan v. State*, 787 S.W.2d 53, 57 (Tex.Crim.App. 1990).  Likewise, the prosecutor is not permitted to convey to the jury during argument that he possesses specialized knowledge or expertise about a contested fact issue.  *Jackson v. State*, 17 S.W.3d 664, 675 (Tex.Crim.App. 2000); *see Johnson v. State*, 698

S.W.2d 154, 167 (Tex.Crim.App. 1985); *Johnson v. State*, 698 S.W.2d 154, 167 (Tex.Crim.App. 1985)*, superseded on other grounds by Mayes v. State*, 816 S.W.2d 79 (Tex.Crim.App. 1991)("The implication of special expertise coupled with an implied appeal to the jury to rely on that expertise in deciding the contested issues before it is improper.").

The prosecutor's argument did not violate these rules because she did not get evidence before the jury that is outside of the record nor did she convey to the jury that she had some specialized knowledge about a fact issue. She properly explained that Patterson could not testify to the substance of her conversation with Patrick because it would violate the rules of evidence, but Patterson had testified about what she observed -- after speaking privately with Appellant about what had happened to Chester, Patrick was upset and had tears in his eyes. Because the prosecutor's argument was not improper, the trial court did not abuse its discretion by denying the motion for mistrial. Issue Four is overruled. Having overruled each issue presented on appeal, we affirm the trial court's judgment.

November 4, 2015

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)